UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : Case No. 21-cr-710-TSC |
| | : |
| v. | : |
| | : |
| MICHAEL G. McCORMICK, | : |
| | : |
| Defendant. | : |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Michael McCormick, by and through his counsel of record, Deputy Federal Public Defender Samuel Cross, hereby files his sentencing memorandum for the Court's consideration before the Court's December 20, 2022, sentencing hearing. Mr. McCormick will be sentenced following his plea of guilty to one count of Parading, Demonstration, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a class B misdemeanor. For the reasons that follow, Mr. McCormick respectfully recommends that the Court place him on a term of probation for one year under the terms and conditions proposed in the presentence report (PSR), and not impose a custody sentence. Should the Court impose a custody sentence, Mr. McCormick recommends that the sentence not exceed 12 days, in order to permit him to keep his job. If the Court imposes a custody sentence, Mr. McCormick would oppose the imposition of any term of supervision to follow as an impermissible "split sentence" under 18 U.S.C. § 3561(a). Mr. McCormick further recommends that the Court not impose a fine beyond the restitution amount to which the parties have agreed.

1

Mr. McCormick, a hardworking 52-year-old man from the Los Angeles area, has led a simple and almost entirely law-abiding life. An earnest but relatively unsophisticated political participant, he has for many years not only voted in American elections, but participated in the directly democratic politics of the Comanche Nation, although he resides in California. On January 6, 2021, he went to Washington, D.C. to see former President Donald Trump speak, and, regrettably, followed the former President's exhortation to walk to the United States Capitol Building, where he walked through the Senate Wing Door, which had been breached some time previously, and passed briefly through the halls of the building before exiting, all told spending about eight minutes inside. While Mr. McCormick is culpable, his specific personal circumstances, most importantly including his history of law-abiding hard work and current employment situation, do not warrant a lengthy custody sentence. A period of probation will be sufficient to achieve the aims of sentencing; or, in the alternative, a sentence of no more than 12 days.

## I. Relevant Personal Background, Offense Conduct, and Procedural History

### a. Personal Background

Mr. McCormick was born in 1970 in Garden Grove, California. PSR ¶ 40. His parents both worked for public institutions; his father worked for the Orange County Unified School District as a handyman, and his mother worked as a clerk for the federal bankruptcy court. *Id.* Although Mr. McCormick describes a happy childhood, his parents divorced when he was 14, which he remembers as a bitter experience. *Id.* ¶¶ 42, 43. Over the years, however, he has formed and maintained strong relationships with his family members, including both parents. *Id.* ¶ 44. He was active in soccer during high school, but dropped out in the eleventh grade to begin

working.  *Id.* ¶ 42, 61.  Although he attempted to complete a diploma later, he never did.  *Id.* ¶ 61.

As an adult, Mr. McCormick has worked hard and been consistently employed, despite his relatively limited education.  He ran a pool cleaning business in Riverside, California, for some years, but during the recession in 2008 was forced to give up that business and begin driving as a contract driver.  PSR ¶¶ 68, 66.  Although he had moved out of his mother's home at age 30, the recession forced him to return to living there, where he has lived since.  *Id.* ¶ 46.  At the age of 35 he obtained a Commercial Driver's License, and has worked as a contract driver for various employers.  *Id.* ¶ 66.  Presently, he works in a unionized driver position at UPS in Inglewood, California.  *Id.*  His fellow drivers describe him as uncomplaining and willing to help out.  Ex. A.  He has also received a certificate commemorating one year of safe driving as a UPS employee.  Ex. B.

Although Mr. McCormick struggled with alcohol misuse when he was younger, resulting in a DUI conviction in 2001, he took charge of his life, attended AA meetings, and now reports that he is an only occasional drinker with a healthy relationship to alcohol.  PSR ¶¶ 29, 56.  He has no other substance abuse problems of any kind and no other notable criminal history.

Mr. McCormick has Comanche heritage.  PSR ¶ 49.  As a child, he resented not being formally enrolled as a member by his father, and in 2007, he became one himself.  *Id.*  His aunt in on the Council of Elders, and he enjoys both visiting Comanche tribal land to learn about his heritage and voting in tribal elections.  *Id.*

    b. **Offense Conduct**

As the Court is well aware, Mr. McCormick was one of many thousands of Americans who were persuaded by former President Trump's often-repeated lie that the American

presidential election had been "stolen" by any number of ill-defined and unexplained supposed schemes. Along with many thousands of other Americans, and acting under the influence of this inflammatory lie, propounded by the then-sitting President of the United States, Mr. McCormick flew to Washington in order to hear President Trump speak, at President Trump's behest. PSR ¶ 15. At nontrivial personal expense, Mr. McCormick flew from Orang County, California, to Washington D.C., staying in a hotel there with plans to hear the President address his supporters. *Id.*

At the January 6 rally, former President Trump repeated his lie, asserting with varyingly hazy degrees of substantiation that he had in fact won the presidential election.[1] Describing the election that had recently occurred as "the most brazen and outrageous election theft and there's never been anything like this," the President urged his supporters to march to the nearby Capitol building. Naylor, *Trump's Jan. 6 Speech*. Although the President claimed that "everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard," he also spoke of "show[ing] strength," and addressed Vice President Mike Pence in threatening apostrophe, urging him to "do[] the right thing" by interfering with the then-occurring certification of the electoral college results. *Id.* Although the President used the first-person plural, suggesting that he would walk with his supporters to the Capitol building, notoriously he did not. *Id.*

---

[1] For example, the President stated: "And I was told by the real pollsters — we do have real pollsters — they know that we were going to do well and we were going to win. What I was told, if I went from 63 million, which we had four years ago, to 66 million, there was no chance of losing. Well, we didn't go to 66, we went to 75 million, and they say we lost. We didn't lose." Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR Online, Feb. 10, 2021, available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

Instead, the crowd marched to the Capitol without Trump.  Some of its members forced entry to the Capitol building around 2:00 pm.  PSR ¶ 13.  The proceedings inside were halted and Members of Congress and staff were evacuated while bedlam ensued in the exterior of the Capitol and interior hallways.  *Id.* ¶¶ 13, 14.  Around an hour after the first breach, Mr. McCormick, who had also walked to the Capitol with the crowd, wandered through the open Senate wing door at approximately 2:55 p.m.  *Id.* ¶ 16.  During his roughly eight-minute walk through the corridor he had his cell phone camera on.  *Id.*  He walked through the Capitol Crypt and Hall of Columns, then exited through the South Doors at 3:03 pm.  *Id.*

After the FBI identified Mr. McCormick during their investigation, they contacted him by phone on November 18, 2021.  McCormick 302, Ex. D.  After being contacted, Mr. McCormick drove to meet the FBI where they were waiting at his house, in a panic deleting the pictures and videos that he had taken at the Capitol from his phone.  PSR ¶ 16.  When he arrived, he cooperated fully with FBI agents, told them he had deleted the materials from his phone, and gave them his phone password.  McCormick 302.

    c.  **Procedural History**

Mr. McCormick was charged by criminal complaint on November 16, 2021.  ECF No. 1.  As noted above, he was interviewed and arrested two days later on the Complaint, on November 18, 2021, at his home in Orange County, California.  He made his initial appearance in the Central District of California that day, and was appointed the undersigned counsel.  ECF No. 4, *United States v. McCormick*, 8:21-mj-777 (C.D. Cal. Nov. 18, 2021).  He was released on his own recognizance.  *Id.*  He made an initial appearance via video teleconference in the District of Columbia on December 2, 2021.  He was charged the next day in an Information with four counts relating to the events of January 6, 2021.  ECF No. 8.  On July 18, 2022, he pleaded guilty

again via video teleconference, to Count IV of the Information, which charged him with Parading, Demonstration, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a class B misdemeanor.  Jul. 18, 2022, Minute Entry.  This was pursuant to a plea agreement with the United States, which among other things stipulated to a total loss amount of $1,495,326.55 in damage to the United States Capitol and an individual restitution amount for Mr. McCormick of $500.  ECF No. 23.

A presentence report was prepared.  ECF No. 27.  The PSR noted that the offense of conviction was a Class B misdemeanor and "petty offense" under 18 U.S.C. §§ 19 and 3583(b)(3), and that therefore the United States Sentencing Guidelines did not apply to the offense, and a term of supervised release was not applicable.  PSR ¶¶ 80, 83.  The PSR noted that the maximum term of custody imposable was six months, and up to five years of probation is an option.  *Id.* ¶¶ 79, 85.  Mr. McCormick filed a notice indicating he had no objections to the contents of the PSR, and the government also filed no objections.  ECF No. 29.

## II.     The Court Should Impose a Sentence of One Year of Probation in Light of All the Factors Listed at 18 U.S.C. § 3553(a)

### a.  Legal Standard

Although as noted above the United States Sentencing Guidelines do not apply to this offense or guide the Court's sentencing discretion, the familiar factors listed at 18 U.S.C. § 3553(a) do.  Section 3553(a) commends an array of factors to the Court's attention at sentencing, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B) to afford adequate deterrence to criminal conduct;

  (C) to protect the public from further crimes of the defendant; and

  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available; . . . .

(5) any pertinent policy statement . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

  **b. Argument**

At the outset, Mr. McCormick notes that it is unresolved in this circuit whether the Court has the authority, should it impose a custody sentence, also then to impose a period of court supervision to follow.  The question is raised by a case currently pending before the United States Court of Appeals for the District of Columbia Circuit.  *See United States v. Little*, Case No. 22-3018 (D.C. Cir. 2022).  Mr. McCormick believes the 3553(a) factors favor a sentence of one year of probation; however, should the Court disagree and impose a custody sentence, Mr. McCormick believes the Court lacks authority to impose any kind of supervision to follow.  Argument to this effect is presented below, briefly, in Section III, and also in the attached Appellant's Brief filed by the Federal Public Defender in *Little*. Ex. C.

  Although a probationary sentence is appropriate, Mr. McCormick also recommends that if the Court imposes a custody sentence, that sentence not exceed 12 days.  This is supported by

the factors discussed below, and also by a specific aspect of Mr. McCormick's personal characteristics. Mr. McCormick informs the undersigned that he works six-day weeks, and is only able to miss work by taking accumulated leave days. He has accumulated five such days, or six less the day he will take in order to be present for sentencing in this matter. He will accumulate five more such days on the first of the new year. This means that the maximum time he would be able to take off from work without losing his employment is approximately 12 days. Although the Court has authority to impose any legal sentence, and Mr. McCormick respects the seriousness of the task before the Court in this and similar sentencings, he asks the Court to take into account the importance of this job to himself and his family when fashioning its sentence.

### i. Nature and Circumstances of the Offense and History and Characteristics of Mr. McCormick

January 6, 2021, was a day of crisis for the United States and its political system. That system's ability to effectively reproduce itself via the peaceful transfer of power was shaken as never before by the actions of the President and his supporters. Mr. McCormick does not dispute this. However, the Court must carefully consider where responsibility lies, and, under 18 U.S.C. § 3553(a), how much culpability can flow to an individual participant like Mr. McCormick.

Mr. McCormick and the others assembled with him to hear President Trump's speech were told a lie, one they were primed to believe because it had been told to them incessantly since the presidential election of 2020. Mr. McCormick and the other attendants were told in the most strident, aggressive terms possible, directly by their President, that the election had been stolen, and democracy was being actively subverted. Mr. McCormick, as an individual, was not well equipped to evaluate this message critically, spouted as it was from the loudest and most authoritative mouthpiece in American politics. He never finished high school. He attained no

higher education of any kind.  He, like many Americans, and particularly many poor and low-skilled workers, had suffered precarity, job loss, and reduction in personal means during the economic downturn of 2008.  Despite having worked to obtain a commercial driver's license, he has had difficulty sustaining a good job and had to live with his mother and brother since 2008.  He is, in other words, personally and economically vulnerable, and not easily able to critically analyze and reject President Trump's conspiratorial attribution of personal or societal misfortune to shadowy elites, or an opposing political party.

Even more unfortunate, Mr. McCormick is in fact an avid and ingenuous political participant, and thus his enthusiasms are easily taken advantage of.  He sought to be enrolled as a voting member of the Comanche nation, and enjoys participating in their directly democratic process out of sincere personal belief.  It is not hard to see how such sincere belief coupled with lack of political sophistication could be abused by a skilled political operator.

All this is mitigating but not exculpating, Mr. McCormick concedes.  He did, as alleged in the Information and admitted in his plea agreement, take his political demonstration into the halls of Congress, where he should not have, and which were closed to the public at that time.  Many partisans around him committed violent acts in support of President Trump.  However, Mr. McCormick did not.  Mr. McCormick is soft-spoken and retiring, with no history of violence of any kind.  He simply walked through the already-breached Capitol building, for a short time.  He did not, as many others did, aggressively or belligerently interact with the police or others.  He did not attempt to take anything.  Notably, he did not attempt to mill around or remain in the building, instead following the flow of foot traffic through the chaotic scene.  Although fed a violent political message, Mr. McCormick did not act violently; it is not in his nature.

Mr. McCormick concedes that his destruction of materials on his phone is aggravating. However, he submits to the Court that it is not seriously aggravating, because he was honest with federal investigators immediately afterward, and told them what he had done, as well as supplying the password to his phone. Other than this, there are no significantly aggravating features of the offense.

Mr. McCormick's personal history and characteristics are otherwise mitigating. He has a history of hard work, and is currently working hard at a good, unionized job that he wishes very much to keep. He is valued by his co-workers and has a close and loving relationship with his family. He has shown, via his struggles with alcohol, that he can recognize behaviors that need change and change them.

## ii. Just Punishment, Deterrence, Protection of Society, and the Need to Avoid Unwarranted Sentencing Disparities

As to individual deterrence, Mr. McCormick has shown, through his proactive response to receiving a DUI more than 20 years ago, that a stiff sentence is not necessary to keep him from recidivism. Instead, he is willing to take significant steps to change his own life and behavior in order to comply with the law. Aggressive use of the criminal sanction is unnecessary to correct Mr. McCormick's individual behavior; probation is sufficient. For the same reasons, the community has little need of protection from Mr. McCormick, and to the extent that it does need such protection, a comparatively short period of probation will suffice.

Almost uniquely, this offense combines questions of general deterrence on a massive scale with just punishment and the need to avoid unwarranted sentencing disparities. Mr. McCormick attaches hereto a table of some 300-odd defendants, the government's recommended sentence, and the sentence imposed by the sentencing judge in Capitol cases. Ex. E. (This table

10

was recently filed by the United States as ECF No. 59-1, *United States v. Yazdani et al*, 1:21-cr-543-CDC (D.C. Nov. 1, 2022). It thus represents a fairly recent overview of January 6 defendants and their sentences. The government will perhaps file a similar table in the instant matter.) In the absence of applicable sentencing guidelines, courts sentencing misdemeanants are asked to ensure horizontal sentencing equity by comparison with a vast number of other January 6 defendants. In some ways all defendants are extremely similarly situated. All defendants were at the Capitol on January 6, and all defendants engaged in illegal activity connected with President Trump's speech and the events that followed at the Capitol buildings. However, each defendant engaged in different conduct, and each defendant has a different personal background. It is plainly impossible to compare all of them to each other with granularity.

Some general features stand out, however. Many misdemeanants convicted of violating 40 U.S.C. § 5104(e)(2)(G) received sentences that consisted only of probation, but many received sentences that consisted of institutional custody or home detention. Ex. E. In order to avoid unwarranted sentencing disparities, therefore, as an empirical matter (and in a way rarely possible to see in other sentencing contexts) courts cannot presume the 5104(e)(2)(G) misdemeanants should necessarily, or even presumptively, be either incarcerated for a period or placed on probation. Nothing about the need to impose just punishment, or to recognize through the criminal sanction the magnitude of January 6's events, requires a custody sentence. Instead, even though by hypothesis all January 6 misdemeanants committed crimes connected with a threat to the peaceful transfer of American political power, the Court should not presume that custody is appropriate; instead, an individualized determination mist be made.

Two conclusions follow. One, the greatest point of applicability for 18 U.S.C. §§ 3553(a)(2) and (a)(6) to 5104(e)(2)(G) sentences is in edge cases of great severity, where the sentence imposed will fall at the high end of the typical sentence, and thus will be more meaningfully conditioned by the typical sentence of no custody or a few weeks to a month. Second, there is an emerging consensus amongst judges sentencing in January 6 cases that sentences toward the bottom of the statutory range are appropriate to the particular circumstances of almost all 5104(e)(2)(G) misdemeanants. *See* Ex. E p. 8 (by the count of the undersigned, reflecting the maximum 6 month sentence for 5104(e)(2)(G) defendants in only two cases, both of which are noted as amounting to time served).

### iii. Restitution and Fine

Mr. McCormick respectfully submits that the parties' agreed restitution amount of $500 is appropriate. Furthermore, he submits that a fine is inappropriate in this case based upon his demonstratedly limited means. *See* PSR ¶ 76. Should the Court choose to impose a fine, Mr. McCormick recommends a modest fine to match his modest means.

### III. The Court Lacks Authority to Impose a Sentence Consisting of a Term of Custody and Following Supervision, Because the Instant Offense is a Class B Misdemeanor "Petty Offense"[2]

40 U.S.C. § 5104(e)(2)(G) is punishable by up to 6 months in prison, making it a Class B misdemeanor. It is also, therefore, a "petty offense." *See* 18 U.S.C. § 19 (defining "petty offense" to be Class B and C misdemeanors and infractions). Statute authorizes two functionally identical forms of court supervision for convicted criminal defendants who are not incarcerated:

---

[2] As noted above, the argument presented here is undecided in this Circuit, and is presently pending in *United States v. Little*, Case No. 22-3018 (D.C. Cir. 2022). More elaborated argument is presented in the Appellant's Brief in *Little*, attached hereto as Exhibit E.

12

probation and supervised release.  Supervised release is authorized only for felonies or "misdemeanor[s] (other than a petty offense)." 18 U.S.C. 3585(b).  Thus, supervised release is not authorized for convictions under 40 U.S.C. § 5104(e)(2)(G).

Probation is authorized as follows:

(a) In general.--A defendant who has been found guilty of an offense may be sentenced to a term of probation unless--

(1) the offense is a Class A or Class B felony and the defendant is an individual;

(2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense.

18 U.S.C. § 3561.  Each of the three numbered subsections of 3561 thus prohibit probation in certain delineated circumstances.  Mr. McCormick argues that subsection (a)(3) precludes probation here, should he be sentenced to a term of imprisonment, because the subsection precludes probation when a defendant is sentenced to imprisonment "for the same . . . offense." 18 U.S.C. § 3561(a)(3).

The obvious infelicity of subsection (a)(3)'s drafting has created great uncertainty about how it should be interpreted, and significant recent litigation because of its application to January 6 cases such as the present one.  *See, e.g.*, *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *4 (D.D.C. June 7, 2022); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *2 (D.D.C. Apr. 29, 2022).  This is because it is unclear whether the phrase "for the same or a different offense that is not a petty offense" should be construed to mean "for the same offense, or for a different offense that is not a petty offense," or rather, "for the same offense that is not a petty offense, or for a different offense that is not a petty offense."

13

If the former, then probation is prohibited when a defendant is sentenced to a term of imprisonment on a single offense, and when a defendant is sentenced to a term of imprisonment simultaneously for any other offense at the same time, unless that offense is a petty offense. If the latter, then probation is prohibited when a defendant is sentenced to a term of imprisonment on an offense, unless that offense is a petty offense, and when a defendant is sentenced to a term of imprisonment simultaneously for any other offense at the same time, unless that offense is a petty offense. If the former, then probation is prohibited for sentences imposed on solo petty offenses that include incarceration. If the latter, both probation and incarceration can be imposed in such a case. Mr. McCormick maintains the former—they cannot both be so imposed.

Put another way, the question is whether the modifying relative clause "that is not a petty offense" modifies both "the same [offense]" and "a different offense," or just "a different offense."[3] Mr. McCormick maintains the latter, more limited interpretation of the relative clause—it does not modify "the same [offense]."

Mr. McCormick incorporates by reference the arguments in the attached briefing in *Little*, including those to do with legislative intent and canons of statutory interpretation. Ex. C. However, in Mr. McCormick's view, the well-known injunction to interpret statutes according to

---

[3] The above-mentioned infelicity appears mostly to be a product of the drafters' having chosen the slightly odd locution "the same or a different offense," choosing permissibly, as a matter of grammar, but here highly confusingly, not to repeat after "same" the noun "offense," and thus failing to clearly delimit the extent of the relative clause that follows. The relative clause was, in fact, tacked onto "the same or a different offense" in a later legislative modification, so the delimitation problem did not appear at the time "the same or a different offense" was drafted. *See* Pub. L. No. 103-322, § 280004, 108 Stat. 1796 (1994); *see also* Ex. C at 7. The intended effect of the modification was probably to clarify that when imposing sentence on more than one petty offense, one sentence could be probationary and the other custody. *See* Ex. C at 7. Clarity did not evidently result.

14

their plain meaning also decides the question, along with rules of grammar perspicuous to any native speaker.

"That" is a restrictive pronoun. As ordinarily used, it picks out a particular item or kind of item from a larger class. *See United States v. Nishiie*, 421 F. Supp. 3d 958, 970–71 (D. Haw. 2019) ("Thus, one says, 'I am giving you the book that is my all-time favorite,' with the 'that' clause restricting which book to only the all-time favorite. By contrast, a 'which' clause usually introduces a nonrestrictive modifier that simply describes, as in 'If you want to buy the book, which is my all-time favorite, you should go to Barnes & Noble, where it is on sale now.'"). A class of items is coherently narrowed in English by a "that" clause. "A different offense," consisting as it does of *any* "different offense," is a potentially infinitely large class of objects that can be cogently constrained by a relative clause. By contrast "the same offense" is a class of one, and cannot cogently be narrowed by a "that" clause. Try saying it: "The same offense that is not a petty offense." A fluent English speaker will correct you: "The same offense, which is not a petty offense," or perhaps, if attempting to indicate logical contingency, "the same offense, so long as the offense is not a petty offense." The statute does not read this way, however. The that clause applies coherently only to "a different offense."

The Court cannot impose a sentence of probation to follow a sentence of custody on this, a single petty offense.

### IV.    Conclusion

For the forgoing reasons, Mr. McCormick respectfully requests that Court impose a probationary sentence of one year, under the terms and conditions proposed by the Probation Office in the presentence report, as specified herein.

Respectfully submitted,

                                        CUAUHTEMOC ORTEGA
                                        Federal Public Defender

DATED: December 6, 2022        By  /s/ Samuel Cross
                                        SAMUEL CROSS
                                        Deputy Federal Public Defender
                                        Attorney for Michael McCormick