**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-710 (TSC)** |
| **v.** | : | |
| | : | |
| **MICHAEL G. McCORMICK,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael G. McCormick to 21 days' incarceration, 36 months' probation and $500 in restitution.

## I.       Introduction

The defendant, Michael G. McCormick, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

McCormick pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

and probation is appropriate in this case because McCormick: (1) approached the Capitol building on the afternoon of January 6 despite observing armored police guarding the building and tear gas choking the air, and despite receiving word of what was happening inside; (2) entered the Capitol at approximately 2:55 p.m. through the Senate Wing Door, approximately 5 minutes after the violent, second breach of that door by rioters; (3) spent approximately 8 minutes inside the Capitol during the riot but then remained on Capitol grounds for over an hour after exiting the building despite being made aware that a rioter had been shot and observing a photo of blood; (4) took a video recording of his entire trespass through the Capitol; (5) deleted pictures and videos he took on January 6 from his phone after the FBI contacted him on the morning of November 18, 2021 and (6) to date, has not offered any contrition for his involvement on January 6.

The Court must also consider that McCormick's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, McCormick's participation in a riot that actually succeeded in halting the Congressional certification combined with his deletion of evidence renders a sentence of incarceration and probation both necessary and appropriate in this case.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 28 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of Congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.

*McCormick's Role in the January 6, 2021 Attack on the Capitol*

McCormick flew from his home in California to Washington, D.C. on January 5, 2021, upset in his belief that the 2020 Presidential Election had been "stolen." On January 6, McCormick attended the rally at the Ellipse, taking photos and videos of the crowd and speakers.

After the rally at the Ellipse, McCormick and the crowd made their way to the Capitol. McCormick took additional photos and videos of the crowd during his walk to the Capitol.  He stopped outside the Department of Justice building and recorded a video in which he repeatedly proclaimed, "We're taking it back.  You can't stop us.  You're never going to stop us."  McCormick also yelled, "Lock them all up.  I'm tired of my country being run by criminals."   After approximately 5 minutes outside the Department of Justice, McCormick continued to the Capitol, approaching the West Front.

After having actively defended a police line for over an hour, the hundreds of District of Columbia Metropolitan Police Department ("MPD") officers who responded to United States Capitol Police ("USCP") officers's calls for help at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. At approximately 2:40 p.m., police officers retreated from the West Plaza. Google geolocation shows McCormick was in the area of the stairs on the West Plaza going up to the Upper West Terrace at approximately 2:41 p.m.

Once on the Upper West Terrace of the Capitol, McCormick continued to film people on scaffolding and jubilantly exclaimed, "Fuck yeah!" A woman next to him said, "They just said Nancy Pelosi's office is ransacked. Is that accurate?" Outside, McCormick filmed dozens of police officers in riot gear making their way through the crowd while he chanted, "USA!" and "Stop the steal!" McCormick also stated, "We're taking it back. Got ya, fuckers!" McCormick also filmed a person next to him remark that the air "tasted spicy" from the pepper spray.

McCormick then made his way to the Senate Wing Door at approximately 2:55 p.m., still filming as the crowd around him chanted, "Police, stand down!" He entered the Capitol at 2:55 p.m. while an audible alarm blared, approximately 5 minutes after the violent, second breach of the Capitol building at this location:



*Figure 1:  McCormick (circled) entering the building; still from Exhibit 3; USCP CCV footage*

McCormick turned right as the crowd chanted, "Traitors!" and moved toward and through the Capitol Crypt, remarking to a police officer, "He said it was going to be wild, huh?" McCormick proceeded through the Small House Rotunda at approximately 3:00 p.m.:



*Figure 2:  McCormick captured in a still from USCP CCV footage*

McCormick paraded past the House Wing Door at approximately 3:01 p.m. as depicted below:

5



*Figure 3:  McCormick (circled) appears to film as he walks through the Capitol*

McCormick walked through the Hall of Columns, exiting the Capitol at approximately 3:03

p.m., as depicted below:



*Figure 4: Another still from USCP CCV footage shows McCormick (in box) continuing to film*

Outside again, McCormick repeatedly giggled and again observed, "He said it was going

to be wild. It was."  In total, McCormick spent approximately 8 minutes inside of the Capitol,

during which time he video recorded his entire demonstration, as depicted in government's sentencing exhibit 4. McCormick has admitted that he knew at the time he entered the U.S. Capitol building that he did not have permission to do so, and he engaged in disorderly and disruptive conduct in the Capitol building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

After leaving the Capitol building, McCormick remained on the east side of the Capitol, filming the crowd.  He filmed a man who was explaining that a rioter had been shot inside.  As depicted in government's sentencing exhibit 5, the man stated that the woman had attempted to go through a window and she was shot because "Senators" were behind the police.  The man showed McCormick a photo on his phone of a pool of blood.  McCormick then returned to the West Front of the Capitol and continued to film the riot for at least another hour, as depicted in government's sentencing exhibits 6 and 7.

On November 18, 2021, the FBI contacted McCormick to arrange for his arrest. McCormick deleted the pictures and videos of January 6 from his phone in an attempt to destroy evidence before surrendering to the FBI.  However, the FBI had already recovered those photos and videos through other investigatory means.

*McCormick's Interview with the FBI*

McCormick was interviewed by the FBI the day of his arrest in California.  McCormick stated he flew to Washington DC to protest and watch then-President Trump speak because he was upset that the election had been stolen.  McCormick stated that on January 6, he watched then-President Trump's speech and walked over to the Capitol building after the speech concluded.  He admitted going inside the building for 15 minutes but denied seeing any violence

inside the building.  McCormick admitted he deleted pictures and videos that he took on January 6, 2021 off of his phone after being contacted by the FBI that morning (November 18, 2021).

*The Charges and Plea Agreement*

On November 16, 2021, McCormick was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 18, 2021, he was arrested at his home in California.  On December 3, 2021, the United States Attorney's Office filed an Information charging McCormick in four counts.  On July 18, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, McCormick agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

McCormick now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, McCormick faces up to six months of imprisonment, up to five years of probation, and a fine of up to $5,000. McCormick must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 21 days' incarceration and 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing McCormick's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like McCormick, the absence of violent or destructive acts is not a mitigating factor. Had McCormick engaged in such conduct, he would have faced additional criminal charges.

McCormick entered the Capitol through the Senate Wing Door just five minutes after rioters violently breached the building there for a second time that day.  Before even entering the Capitol, McCormick had heard a woman remark that the Speaker of the House's office had been "ransacked," he had filmed dozens of police officers in riot gear making their way through the crowd, and a person next to him had remarked that the air "tasted spicy."  As evidenced by the video McCormick recorded, people moving throughout the Capitol were not respectfully touring the building; they were yelling and causing damage.

Further, once McCormick exited the Capitol, another rioter explained to him that a rioter had been shot inside the Capitol, and he showed McCormick a photo on his phone of a pool of blood.  Even upon hearing that someone had just been shot by a police officer in the Capitol, McCormick remained on Capitol grounds, returned to the West Front of the Capitol, and continued to film the riot for at least another hour.  To date, McCormick has not expressed remorse for his conduct on January 6, 2021.  Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration and probation.

### B.  McCormick's History and Characteristics

As set forth in the PSR, McCormick has a long history of employment as a truck driver, a minor criminal history, and past struggles with alcohol. ECF No. 27, ¶¶ 65-69, 23-29, 56-57. He appears to have been compliant with his conditions of pre-trial release.

His prior involvement with the criminal justice system was an arrest in 2001 for driving while intoxicated, which resulted in a probationary sentence. *Id.* at ¶ 29.  Additionally, the PSR shows that McCormick had several vehicle code violations from 1990-1993, *e.g.*, driving with a suspended license and possession of marijuana, which resulted in probation or a few days in jail. *Id. at* ¶¶ 23-29.

Although McCormick deleted the photos and videos on his phone after the FBI contacted him in November 2021, since then, McCormick has taken responsibility for his actions. McCormick accepted the government's plea offer early in this case, demonstrating his acceptance of responsibility, though he declined to elaborate in the PSIR or offer any contrition for his actions of January 6.  *Id.* at ¶ 19.

Considering his minimal criminal history and his post-arrest conduct, the government requests a probationary sentence with a short period of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### 1.  General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### 2. *Specific Deterrence*

McCormick's statements on January 6 that he's "tired of my country being run by criminals" and "we're taking it back" underscore his motivation for illegally entering the U.S. Capitol.  This motivation for committing the instant offense has not subsided, making supervision warranted in this case.

The government acknowledges that McCormick accepted responsibility early by entering into this plea agreement. On the other hand, his conduct and statements on January 6, 2021, and his proximity to those using violence to achieve that goal show the need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress. This Court must sentence McCormick based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

McCormick has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating or Picketing in the Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may also consider the sentence of 14 days of incarceration it imposed on the defendants in *United States v. Brandon and Stephanie Miller,* D.D.C. 21-cr—226 (TSC).  The Millers entered the Capitol together through a window by the Senate Wing Door at approximately 2:56 p.m. after the violent secondary breach of that door. They paraded through the Crypt to the House Wing Door, turned around briefly, before turning again and exiting the Capitol through the Hall of Columns at approximately 3:07 p.m.  During their time in the Capitol, Brandon broadcasted on Facebook Live and evidence from their phones showed both displayed pride in having gone inside the Capitol.  *See* 21-cr-266-TSC, Dkt. Nos. 49 and 50.

This case is also similar to *United States v. Thomas Uberto,* D.D.C. 22-cr-007 (TSC). Uberto entered the Capitol through the Senate Wing Door 3 minutes after McCormick, walked the same path as McCormick for over 8 minutes, took photos of the riot inside the Capitol and made an inflammatory social media post.  This Court will sentence Uberto in January 2023. The government has recommended a sentence of 14 days' incarceration in that case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   A sentence of probation may include imprisonment as a condition of probation.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."   18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[3]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits.").

---

[3] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10).  *See Anderson*, 787 F. Supp. at 539.  Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days.  *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).  Imposing an intermittent confinement sentence with 21 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the

Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[4]

### VI.    A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 21 days in prison and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[5]

### VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Michael G. McCormick to 21 days' imprisonment, 36 months' probation and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

---

[4] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[5] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Douglas G. Collyer*
        DOUGLAS G. COLLYER
        NDNY Bar No. 519096
        Assistant United States Attorney
        U.S. Attorney's Office
        14 Durkee Street, Suite 340
        Plattsburgh, New York 12901
        Office: 518-314-7800
        Douglas.Collyer@usdoj.gov